THE WHITLOCK MANUFACTURING COMPANY *v.*
JOHN J. EGAN, ADMINISTRATOR

SUPERIOR COURT        HARTFORD COUNTY        FILE No. 96377

Memorandum filed June 14, 1954.

*Day, Berry & Howard,* of Hartford, for the plaintiff.

*William L. Beers,* attorney general, and *Harry Silverstone,* assistant attorney general, of Hartford, for the defendant.

MOLLOY, J. This action is an appeal by The Whitlock Manufacturing Company from an assessment made by the defendant, administrator of the Unemployment Compensation Act. The question for decision is whether the plaintiff is liable for unemployment compensation contributions with respect to the wages paid to the employees in the cafeteria conducted on its premises; in other words, whether the operation of the cafeteria by the contractors,

formerly Mrs. Kathryn Hodge and now Fred P. Hagedorn, was work which was a part of the plaintiff's "usual trade, occupation, profession or business."

The administrator claims that the assessment should be sustained on either of two grounds: (1) such employees are direct employees of the plaintiff; (2) if not direct employees, then the plaintiff is liable under the provisions of General Statutes, § 7496 (as amended, Cum. Sup. 1953, § 2301c). This statute reads in part as follows: "If an employer shall contract with or shall have under him any contractor or sub-contractor for any work which is part of said employer's usual trade, occupation, profession or business, and which is performed in, on or about premises under such employer's control, and if such contractor or sub-contractor shall not be subject to this chapter, such employer shall, for all the purposes of this chapter, be deemed to employ each individual in the employ of such contractor or subcontractor for each day during which such individual is engaged solely in performing such work."

The plaintiff has its plant in West Hartford and manufactures heavy equipment—heaters, coolers, heat exchangers, coils, and pressure vessels. It employs between 200 and 450 persons. Its schedule of operation allows a lunch period at noon of one-half hour. There are not sufficient restaurant facilities in the immediate neighborhood of the plant to provide adequately, and in the time allowed, for the feeding of its employees. From 1925 to 1943 there had been no cafeteria at the plaintiff's plant and employees thereof carried their lunches to work or ate at whatever restaurants were within reasonable distance of the plant. In 1943 the plaintiff remodeled and converted a garage building on its premises for use in part as an auditorium for company meetings and in part as a cafeteria for the accommodation

and convenience of its employees, as a matter of better employee relations. The cafeteria has been in operation since 1943.

On June 26, 1953, the defendant, under the provisions of § 7496, levied an assessment against the plaintiff for contributions under the Unemployment Compensation Act in the amount of $209.86, plus interest of $28.36, which assessment was based upon wages paid by the cafeteria operators to their employees.

To render the plaintiff liable under this statute, four requirements set forth therein must be established: (A) The relation of principal and contractor or sub-contractor must exist with respect to the work which is to be done for the plaintiff. (B) The work performed must be in, on or about premises controlled by the plaintiff. (C) The work performed by such contractor must be work which is part of the plaintiff's "usual trade, occupation, profession or business." (D) The contractor must not be subject to the provisions of the Unemployment Compensation Act.

At the time the plaintiff "went into the cafeteria game," as its vice president said, it invested approximately $3000 in remodeling the garage and it purchased and installed therein a fully equipped kitchen and all the other equipment and dishes necessary for the operation of the cafeteria, at the cost of $2331.16. The contracts for the operation of the cafeteria, first with Mrs. Hodge and then with Mr. Hagedorn, were oral and terminable at will. They provided that the operator was to plan the meals, buy and pay for the food, and prepare and sell meals to the plaintiff's employees, and was to hire the necessary help to accomplish this purpose and retain the proceeds of the sales, the same as if it were her or his own business. The company was to

turn over to the operator without charge its cafeteria equipment, provide without charge light, heat, cooking fuel and janitor service, and replace broken dishes; also to pay the operator a so-called "subsidy," the amount of which was to fluctuate according to the number of employees in the factory from time to time, and the net return to the operator from the sale of meals. The payment of the "subsidy" to the operator was necessary because the net return from the sale of food was not sufficient to make it worth while to the operator to operate the cafeteria, or, as otherwise stated, not sufficient to make it worth while to perform the service which the plaintiff needed to round out its program, pursuant to which it established the cafeteria.

In the case of Mrs. Hodge, the amount of the subsidy was fixed at $35 per week; it was increased in 1947 to $50 per week and decreased in 1948 to $40 per week; then increased to $45 and in 1953 to $50 per week. The objective was to keep the operator satisfied—to "make a better living" for her. In the case of Hagedorn the "subsidy" was continued in 1953 at $50 per week. His net return for the year was $3000, which included the subsidy of $2600. Mr. Hagedorn, when he took over the operation of the cafeteria, was to charge for meals "in accordance with a schedule which Mrs. Hodge had established." The plaintiff was to otherwise take no part in, nor exercise control over, any phase of the cafeteria's everyday operation. The operator, other than by the subsidy, and his employees, were not carried on the pay roll of the plaintiff. The operator handled the employees' income tax and social security payments and kept his own books.

The answer to the problem in this case is not easy of solution, and this is so because of the fact that the "subsidy," so-called, was paid by the plaintiff to the operator of the cafeteria which it wanted oper-

ated on its premises for the convenience of the employees.

While the plaintiff alleged that the administrator's act and conclusion were "erroneous, illegal, arbitrary and unreasonable," in the case of *Beaverdale Memorial Park, Inc.* v. *Danaher,* 127 Conn. 175, the court held at page 183: "In an appeal under the statute applicable to this case, the original assessment having been made ex parte and without notice, the aggrieved party is entitled, under the constitution, to a full hearing after notice and the statute provides that upon such hearing the court shall correct the assessment. The question of whether a tax. has been improperly assessed upon a person does not rest in the administrative discretion of the assessing officer but presents a pure question of law based upon the facts of the particular case. If the court finds that the tax has been improperly assessed or is incorrect as to amount or in any other respect, it follows as a matter of course that the assessing authority acted illegally." To determine that question is the function of the court in this case.

There is very little, if any, dispute as to the factual situation. It is a question of the inferences and implications reasonably to be drawn from them, or the interpretation to be given them legally. In *Jack & Jill, Inc.* v. *Tone,* 126 Conn. 114, 119, the court, quoting from *Tortorici* v. *Moosup, Inc.,* 107 Conn. 143, 146, said: "The independent contractor contracts to produce a given result by methods under his own control, while the employee contracts to produce a given result subject to the lawful orders and control of the employer in the means and methods used; these point in some degree to the duty of service to the employer." In the *Tone* case, the court went on to say, "The controlling consideration in the determination whether or not the relationship of master and servant exists, or that of independent

contractor, is: 'Has the employer the general authority to direct what shall be done and when and how it shall be done—the right of general control of the work.' . . . The retention of 'the right of discharge is one of the strong indications that the relationship is one of employment. An independent contractor must be permitted to finish his contract in the absence of breach on his part.'" In *Robert C. Buell & Co.* v. *Danaher,* 127 Conn. 606, 610, the court said: "The determination of the status of an individual as an independent contractor or employee is often difficult . . . and, in the absence of controlling considerations, is a question of fact."

In the *Buell* case, supra, the court also said: "In *Beaverdale Memorial Park, Inc.* v. *Danaher,* 127 Conn. 175, 179 . . . we say that 'the fundamental distinction between an employee and an independent contractor depends upon the existence or non-existence of the right to control the means and methods of work,' and cite *Norwalk Gas Light Co.* v. *Norwalk,* 63 Conn. 495, 524 . . . , in which this distinction is further elaborated. In the latter case we held that the reservations of control being but partial, and existing in certain respects only, did not prevent the existence of the relation of contractee and independent contractor; that the general control over the work, as to the manner and method of its execution, the oversight and direction of the performance of the actual manual labor, remained in the contractor; that the persons doing the work were his servants, not those of the defendant, and that these considerations relating to general control constitute the true test by which to determine whether the relation be that of employer and contractor or that of master and servant. This is the basis of the Beaverdale decision, for there the salesmen were subject to the control of Beaverdale in certain respects only, but the general control was in Sexton, the contractor

who hired them." *Nichols* v. *Hubbell,* 92 Conn. 611, 619.

In the instant case the court is finally convinced that the legal relationship of the plaintiff to the cafeteria operator was that of principal and independent contractor in the work which was to be done for the plaintiff, namely, the operation of its cafeteria. To repeat, by way of emphasis, neither the operator nor his employees were carried on the pay roll of the plaintiff; the operator hired and fired his own personnel; took out his own license for the operation of the cafeteria; paid his own employees, handled their income tax and social security payments; purchased and sold the foodstuffs involved; retained all profits made; utilized his own equipment; and kept his own books and records. The plaintiff retained no right to control the means and methods of cafeteria operation. The company did have the right to terminate the contractual relationship; but this would be inherent in the relationship under the circumstances; either side had the right of termination. There was no right of hiring or firing any employees of the cafeteria in the company. But this right of termination is not conclusive. The plaintiff was not interested in whom the operator hired, what wages were paid him or the hours or conditions of employment; nor did it supervise in any way the business of the cafeteria.

The company's duty was to provide the physical facilities for the cafeteria and a subsidy, which might fluctuate yearly, depending upon the income of the operator and the number of employees in the factory. The defendant argues that the subsidy was a wage, a remuneration for employment. It can well so argue, for it is a very important factor in this problem; but it is not determinative or necessarily conclusive. As the court views it, the cafeteria could not be operated so as to warrant any one undertak-

ing to do so unless the company contracted to underwrite it, or subsidize its operation. The subsidy was an inducement for someone to take over the operation, not for a weekly wage as such, but on a promise to make up the small profit by some such subsidy as would make its operation interesting, moneywise. The operator was the one who "ran the show." Neither the operator nor his employees were employees of the company, despite the privilege granted to them to come under the benefits of the group insurance maintained for all the company employees. It would be harsh to do otherwise.

If there may be some doubt as to the soundness of the court's ruling on the matter of principal and independent contractor, or master and servant relationship, there would seem to be no doubt about the second point relating to the cafeteria not being a part of the plaintiff's "usual trade, occupation, profession or business." As was said in *G. Fox & Co.* v. *Danaher,* 9 Conn. Sup. 429, 433, the word "usual" in the Unemployment Compensation Act must be considered in the ordinary meaning of the word. Similarly, in the case, *Westport Bank & Trust Co.* v. *Administrator,* 10 Conn. Sup. 228.

The plaintiff's usual trade or business is the manufacture of products such as are set forth above, metal products. It certainly is not in the food business; that is not "usual" to its business. To hold the operation of the cafeteria is a part of the plaintiff's "usual" business would be tantamount to holding it is an integral part of the plaintiff's manufacturing processes. The true test to apply is this: Is the cafeteria operation a part of the usual business of the company? And to determine this you must consider whether the work performed, cafeteria operation, is usually associated with such business as the plaintiff engages in; whether the performance of such work is an employment that is usually associ-

ated with such business. The plaintiff's business is that of manufacturing. The operation of the cafeteria is not a "part of the usual trade" of the plain-. tiff as those words are understood under the Unemployment Compensation Act.

For the reasons given the assessment under consideration was improper and illegal. The appeal is sustained and the assessment is vacated.